House Beautiful Homes, Inc., et al. 1 v. Commissioner. House Beautiful Homes, Inc. v. CommissionerDocket Nos. 5002-63 - 5008-63.United States Tax CourtT.C. Memo 1967-51; 1967 Tax Ct. Memo LEXIS 204; 26 T.C.M. (CCH) 261; T.C.M. (RIA) 67051; March 22, 1967Edward G. Sievers, Cravens Bldg., Oklahoma City, Okla., Mervin E. Templin, 1500 United Founders Life Tower, Oklahoma City, Okla., and Thomas F. McIntyre, Byrne A. Bowman, 2700 First Nat'l Bldg., Oklahoma City, Okla., for the petitioners. Robert S. Leigh, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' *206 income tax for the years and in the amounts as follows: DocketTaxableNo.Petitioneryear endedDeficiency5002-63House Beautiful Homes, Inc.11-30-58$ 4,105.0411-30-594,777.5311-30-603.755003-63Highland Homes, Inc.11-30-58$ 5,500.0011-30-595,439.3311-30-601,356.705004-63Spears Realty Company, Inc.11-30-58$10,833.0911-30-598,983.8011-30-604,277.255005-63Spears Painting & Decorating, Inc.11-30-58$ 6,443.5011-30-599,026.3511-30-60373.675006-63Spears Development Company, Inc.11-30-58$10,593.5711-30-599,395.4411-30-603,452.915007-63X-Cel Contracting Company, Inc.11-30-58$ 284.6311-30-594,326.6511-30-603,185.235008-63Johnson County Development Co., Inc.7-31-58$ 2,788.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,386.807-31-606,147.49The issues for decision are: (1) Whether control of each petitioner corporations was acquired by Julius D. Spears for the principal purpose of evasion or avoidance of Federal income tax by securing the benefit of the surtax exemption provided for by section 11(c), I.R.C. *207 1954. 2(2) Whether petitioners, Spears Development Company, Inc., Spears Realty Company, Inc., Spears Painting and Decorating, Inc., and Johnson County Development Company, Inc., are subject to the imposition of the accumulated earnings tax provided for by section 531 and if so whether each such corporation is entitled to the $100,000 accumulated earnings credit provided for by section 535(c). (3) If any of petitioners is subject to the accumulated earnings tax, whether such petitioner is entitled under the provisions of section 535(b) to an additional deduction in computing the income subject to such accumulated earnings tax for such Federal income taxes for the years involved in these cases which would result should the respondent be sustained in the denial to each of these corporations of the surtax exemption provided for under section 11(c). Findings of Fact Some of the facts have been stipulated, and the stipulated facts including those facts contained in the exhibits attached to the stipulation are found accordingly. Petitioners, Spears Development Company, Inc. (hereinafter referred to as Spears*208 Development), Spears Realty Company, Inc. (hereinafter referred to as Spears Realty), Spears Painting and Decorating, Inc. (hereinafter referred to as Painting and Decorating), X-Cel Contracting Company, Inc. (hereinafter referred to as X-Cel Contracting), Highland Homes, Inc. (hereinafter referred to as Highland Homes), House Beautiful Homes, Inc. (hereinafter referred to as House Beautiful), and Johnson County Development Company, Inc. (hereinafter referred to as Johnson County Development) are each a corporation incorporated under the laws of Kansas. Each of these corporations filed its corporate Federal income tax returns for its fiscal years 1958, 1959, and 1960 with the district director of internal revenue, Wichita, Kansas. The fiscal years of Johnson County Development ended on July 31 and the fiscal years of each of the other petitioners ended on November 30. On each of the returns filed by each of petitioners, its address is given as 5830 Outlook, Mission, Kansas. This is the address of E. W. Fisher, the accountant who prepared the returns of each of petitioners and who also was the registered agent in Kansas for petitioners, his address being the registered place of business*209 of each of petitioners in Kansas. Petitioners in these cases are 7 of 12 corporations organized by Julius D. Spears (hereinafter referred to as Julius). Julius is the president and principal stockholder of each of petitioners and also of 5 other corporations organized by him which are: Spears Building Company, Inc. (hereinafter referred to as Spears Building), Spears Construction Company, Inc. (hereinafter referred to as Spears Construction), Beverly Hills Development Company, Inc. (hereinafter referred to as Beverly Hills Development), Quality Spears Contractors, Inc. (hereinafter referred to as Quality Spears), and Jay Dee Realty Sales Company, Inc. (hereinafter referred to as Jay Dee Realty). Each of petitioner corporations kept its books and records and filed its Federal income tax returns on an accrual basis of accounting. During 5 years of military service beginning in 1942, Julius had spent 3 1/2 years in the United States Combat Engineers where he acquired some experience in various types of construction work. Upon leaving the service in 1947, he returned to employment with the Treasury Department which he had left on entering the service and remained so employed for approximately*210 1 year. In 1948 as a result of answering an advertisement in a newspaper, he became involved with two persons who were building houses for sale. He invested $1,500 in the venture, taking a second mortgage on the two houses in Mission, Johnson County, Kansas. The project was unsuccessful for the two builders, and they ceased building operations. Julius hired one of the carpenters and one of the laborers who had been working with the two builders, bought two lots in Mission Highlands, also in Johnson County, Kansas, and commenced building houses thereon. He and the two employees did most of the carpentry work on the houses, but he subcontracted to others the painting, heating, roofing, siding, concrete, and basement work. He sold these houses himself and made a profit. He then bought two other developed lots in Johnson County and with the same two employees and some other nonunion laborers he hired built two other houses. After completing the houses, he held one of them about 6 months and one about 9 months before he sold them. After selling the two houses, Julius purchased other lots in Johnson County, Kansas in the town of Prairie Village. He and the two employees joined the union, *211 did the carpentry and laboring work themselves and subcontracted the other work on the houses. He sold these houses through brokers and then bought some lots in Mission Village, Johnson County from two bankers whose bank was financing him and who as individuals were developing lots by installing the streets and utilities. Julius bought the lots fully developed and built houses on them. He would buy the lots in groups of 6 to 12 at a time and in all purchased a total of 59 lots from these bankers. The bank financed the building of the houses through construction loans. Except for the carpentry and labor work and some of the concrete work which Julius and his two employees did, he subcontracted the work on these houses. Julius sold the houses through a broker or a real estate salesman on a commission basis. Throughout 1949 and 1950 and into 1951, Julius continued to buy developed lots in Johnson County, Kansas and build houses thereon, selling them either through a broker or a salesman on a commission basis. In 1951 Julius acquired a piece of property in Johnson County, mostly in the city of Overlook Park, this property starting at around 72nd Street and Lamar Avenue. This property*212 was partially developed and partially undeveloped. This property had been made a part of a benefit district which is a method used by a group of owners who join together to develop property. At the time Julius acquired this property, the previous owner had installed the water for the houses on the south side of 72nd Street Terrace so that there were 25 lots on which building could be commenced. Julius had to put in the sewer and the gas line. This property was known as Maple Crest No. 2. On October 9, 1951, Julius formed a Kansas corporation under the name of Spears Building Company, Inc., with an initial capital of $10,000 (1,000 shares, par value $10 per share), all of which Julius contributed in cash in return for all the common stock of the corporation with the exception of the qualifying shares. Julius transferred several lots in Maple Crest No. 2 to the corporation which did the necessary further development work and built houses on the lots. The articles of incorporation of Spears Building provided for corporate purposes of a broad nature. The nature of the corporate business was set forth in 12 separate subparagraphs of the fourth paragraph of its corporate charter. The*213 nature of the business as set forth permitted the corporation to conduct a general contracting and real estate development business of any type; to buy, purchase, manufacture, assemble, distribute, lease, acquire, sell, or dispose of in any manner all kinds of contractors' or engineering equipment; to acquire by purchase, lease, exchange, or otherwise, and to own, hold, and possess lands, real estate, buildings, factories, and structures of any kind; to purchase for investment or resale buildings or structures; to engage in real estate development; to manufacture, buy, sell, deal in, and install ventilating, refrigeration, electrical, gas, and water systems; to advance and lend money to builders, tenants, or others; to purchase and own corporate stock; to invest and deal with moneys of the corporation in any lawful manner; to borrow or raise money for any purpose of the company and to secure the same by indebtedness or obligation of the company, and for that purpose to mortgage, pledge, hypothecate, or charge any property of the company; to enter any lawful contract or contracts with any persons or firms. Generally, these functions were permitted to be carried on inside or outside*214 of the State of Kansas or anywhere throughout the world. In its fiscal year ended September 30, 1952, Spears Building completed and sold, together with the lots on which they were built, 20 houses. During its fiscal year ended September 30, 1952, Spears Building had between 20 and 30 employees engaged in the work of building houses. After purchasing the property in Maple Crest No. 2, Julius bought a 5-acre tract of land at 75th and Horton Streets in Johnson County from an individual named Edlunds. This land had been platted but was otherwise undeveloped. Julius referred to this tract of land as Edlunds Resurvey. The land lay in the city of Overland Park just west of a then more prestigious area in Prairie Village. At the time Julius purchased the land, 75th Street was a dirt road and the north boundary of the property, 74th Street, a gravel road. The property was only 4 or 5 blocks from the property which Julius had purchased at 72nd Street and Lamar Avenue, part of which he had transferred to Spears Building. Spears Building had done no building on approximately 25 lots on the north side of 72nd Street Terrace in Maple Crest No. 2, since this property was involved in a benefit*215 district in an effort to have the county put in certain utilities to be charged to the lot owners on a pro rata basis. On November 24, 1952, Julius formed two corporations, Spears Development and Spears Construction. The articles of incorporation of each of these corporations were substantially the same as the articles of incorporation of Spears Building. Julius owned all of the corporate stock of each of these corporations, except qualifying shares, the total stock issue of Spears Development being 500 shares for which Julius paid in $5,000, and the total issue of Spears Construction being 500 shares for which Julius paid $5,000. Julius was president of both of these corporations. In November 1952 Julius transferred certain of the platted lots in Edlunds Resurvey to Spears Development, which transferred some of them, subject to the obligation of installing certain improvements, to Spears Construction which built houses on the improved lots and sold them to customers. Spears Development had no employees other than Julius, its president, and owned no equipment. It contracted with others for any work it had done in developing lots. Spears Construction used some of the employees of*216 Spears Building for work in building its houses and had no employees other than those who were or had been employees of Spears Building. Spears Construction continued for some period to build and sell houses but at least by 1957 was developing lots which it acquired in an unimproved state. On March 19, 1953, Julius formed a corporation known as Spears Realty with 100 shares of issued stock of a par value of $1,000, all of which except qualifying shares were owned by Julius. The articles of incorporation of Spears Realty were broad and contained provisions of the general nature of those of Spears Building. This corporation initially engaged in selling houses constructed by Spears Building and Spears Construction. At some time between the formation of Spears Realty and the year 1955 Julius or the corporation bought some large lots on a speculative basis from the J. C. Nichols Company in an area of Johnson County known as the Country Club Addition. These lots were held until they increased in value and were sold. After the sale of these lots, Spears Realty began to engage in the land development business. Prior to the formation of Spears Realty Julius had sold most of the houses built*217 by his corporations himself with the help of his wife and a part-time salesman who worked on Saturday and Sunday afternoons. Also, prior to the formation of Spears Realty, Julius had obtained a real estate broker's license in Kansas. In March 1954 Spears Realty employed a part-time salesman and on May 27, 1954, it employed a full-time salesman. Other corporations formed by Julius, the date of their incorporation, the number of shares of stock authorized and the number of shares issued upon their incorporation, the number of shares issued to Julius, and the number of shares issued to others were as follows: No. of shares ofcapital stockPar valueper share ofName ofDate ofOriginallyauthorizedcorporationincorporationAuthorizedissuedcapitalstockPainting and Decorating11-24-543,000100$10.00(commonstock)Quality Spears1-15-54 15,0005010.00(commonstock)X-Cel Contracting4-13-552,00010010.00(commonstock)Highland Homes4-13-552,50020010.00(commonstock)House Beautiful4-13-555,0004005.00(commonstock)Johnson County4-13-551,50025020.00Development(commonstock)Jay Dee Realty4-13-5510,0001,0001.00(commonstock)Beverly Hills1-10-562,50053010.00(commonstock)*218 No. ofSharesName ofissuedNo. of sharescorporationto Juliusissued to othersPainting and Decorating98E. W. Fisher1Lee Gable1Quality Spears49Kenneth E. Bigus1X-Cel Contracting70Treesa Spears30Highland Homes158Arthursell20 2Ethel Parrino22House Beautiful310Treesaspears, Trusteefor Judith Smith30Treesa Spears, Trusteefor Marsha Smith30Treesa Spears, Trusteefor Wm. D. Smith30 3Johnson County198Clara Spears52 4DevelopmentJay Dee Realty800Treesa Spears100Jack Eiler100 5Beverly Hills375Treesa Spears75Bertenia Bishop15Mary Richards50 6Elizabeth Warren15 6*219 Each of these corporations commenced business with the paid-in capital of the par value of its issued shares, all of which was paid in by Julius. Julius was president of each of these corporations. The articles of incorporation of each of these corporations, except the original charter of Quality Spears, contain provisions for corporate purposes and nature of the corporate business substantially the same as those contained in the corporate charter of Spears Building. Treesa Spears is Julius's wife. Ethel Parrino, Mary Richards, Elizabeth Warren, and Bertenia Bishop were sisters of Julius. Clara Spears was Julius's mother. Arthur Sell is the foreman who worked with Julius from the beginning of his building operations in 1948 until August 1959, and Jack Eiler was Julius's sales manager until February 1958. E. W. Fisher is the accountant in whose office the books of all of Julius's corporations were kept. He and Lee Gable served as directors of a number of the corporations, Julius being a director as well as president of each of them. Prior to the organization of Painting and Decorating on November 24, 1954, Julius had subcontracted the painting and decorating for houses built by*220 any of his corporations to outside individuals or firms as he had likewise done for the electrical and plumbing work. Julius's corporations continued to subcontract to unrelated contractors the electrical and plumbing work in the houses they built, but after the formation of Painting and Decorating subcontracted all of their painting and decorating work to this corporation. Certain of the firms to which painting and decorating work was subcontracted by Julius's corporations prior to the formation of Painting and Decorating did unsatisfactory work. At times these subcontractors would use only two coats of paint when the contract called for three. The work of many of the painting and decorating subcontractors was not of a quality which was satisfactory to Julius. The first thing a prospective purchaser of a house is likely to observe is the quality of the painting done in the house. One of the subcontracting firms that did satisfactory work for Julius and his corporations was composed of two individuals, one of whom was named Pete Parker. Parker and his associate were dissatisfied with subcontracting work and the associate left the Kansas City area. Parker approached Julius about working*221 for him on a regular basis instead of as a subcontractor. When Julius incorporated Painting and Decorating, he employed Parker as a superintendent to run the business for him. Painting and Decorating, from the time of its formation throughout its fiscal year ended November 30, 1960, did only painting and decorating for other corporations controlled by Julius, although since 1960 it has done some such work for other builders. It engaged in no activity other than painting and decorating throughout its fiscal year ended November 30, 1960, the last fiscal year involved in this case. In December 1960 it joined with Julius and certain of his other corporations in some form of a joint venture. This corporation, in addition to Pete Parker, who was its superintendent, had a number of employees, most of whom were painters. Quality Spears was originally incorporated on January 15, 1954, by Julius and two other shareholders as a Missouri corporation under the name of Broadcast Group, Incorporated, to engage in the business of owning and operating radio and television stations. Thereafter, this corporation acquired radio station KUSN at St. Joseph, Missouri, and operated the station for approximately*222 4 years, sustaining net operating losses each year. On November 20, 1957, this corporation filed a certificate of amendment of its articles of incorporation authorizing it to engage in the business of purchasing and acquiring improved and unimproved property and in broad terms to otherwise engage generally in the real estate business. On January 4, 1958, the assets of the radio station were sold and the corporation discontinued the business of owning and operating this station. On March 5, 1958, the corporation was authorized to engage in business in Kansas and on April 23, 1958, its articles of incorporation were amended to change its name to Quality Spears Contractors, Inc. Pursuant to Authorization of its board of directors, this corporation, on March 7, 1958, acquired fully developed lots and commenced building or having built for it houses on these lots. Johnson County Development and Beverly Hills had no employees other than Julius and owned no equipment. Any development work which was performed on land transferred to them was done totally by others in accordance with contracts let by them.Quality Spears, X-Cel Contracting, Highland Homes, House Beautiful, and Jay Dee Realty*223 each had employees. Real estate broker's or salesmen's licenses were issued to five persons other than Julius as brokers or salesmen by Jay Dee Realty during the years 1957 through 1959. X-Cel Contracting upon its formation engaged in building houses under contract for others of Julius's corporations but during the years here in issue began purchasing lots in the Beverly Hills and Rancho Santa Fe additions and building houses thereon which were sold to home purchasers. Each of the 12 corporations organized by Julius reported on its Federal income tax return for each of its fiscal years from the first year of its incorporation through its fiscal year ended in 1960 (in 1961 for Beverly Hills) gross sales or receipts, salary paid or accrued to Julius, and net income as shown in the following schedule: Name ofGrosscorporationTaxable yearsales 1Spears Building10/ 9/51 to 9/30/52$258,997.0010/ 1/52 to 9/30/53320,510.0019,407.9910/ 1/53 to 9/30/54380,381.2810/ 1/54 to 9/30/55943,319.7310/ 1/55 to 9/30/5634,582.2010/ 1/56 to 9/30/57806,665.6510/ 1/57 to 9/30/58not available10/ 1/58 to 9/30/59467,291.6610/ 1/59 to 9/30/60647,720.87Spears Development11/24/52 to 11/30/53127,194.3812/ 1/53 to 11/30/54176,375.0012/ 1/54 to 11/30/55241,250.0012/ 1/55 to 11/30/5671,787.6012/ 1/56 to 11/30/5768,175.8012/ 1/57 to 11/30/5881,720.0012/ 1/58 to 11/30/59106,159.3012/ 1/59 to 11/30/6066,787.50Spears Construction11/24/52 to 11/30/53745,383.7012/ 1/53 to 11/30/54880,202.5012/ 1/54 to 11/30/55685,156.3312/ 1/55 to 11/30/5690,247.4512/ 1/56 to 11/30/5784,507.8012/ 1/57 to 11/30/5884,690.0012/ 1/58 to 11/30/5954,484.0012/ 1/59 to 11/30/6050,010.50Spears Realty3/19/53 to 11/30/53not shown12/ 1/53 to 11/30/5459,699.2312/ 1/54 to 11/30/5524,500.0012/ 1/55 to 11/30/56110,548.6712/ 1/56 to 11/30/57None12/ 1/57 to 11/30/5871,714.1012/ 1/58 to 11/30/5989,658.5012/ 1/59 to 11/30/6060,320.00Painting & Decorating12/ 1/54 to 11/30/55140,250.0012/ 1/55 to 11/30/5675,700.0012/ 1/56 to 11/30/5779,150.0012/ 1/57 to 11/30/58139,050.0012/ 1/58 to 11/30/59189,785.0012/ 1/59 to 11/30/60103,780.00X-Cel Contracting4/13/55 to 11/30/55679,651.0012/ 1/55 to 11/30/56772,978.8612/ 1/56 to 11/30/57399,161.3112/ 1/57 to 11/30/58421,737.6712/ 1/58 to 11/30/59648,878.9012/ 1/59 to 11/30/60463,562.25House Beautiful4/13/55 to 11/30/55388,181.0512/ 1/55 to 11/30/56609,785.5012/ 1/56 to 11/30/57554,206.1912/ 1/57 to 11/30/58603,749.2912/ 1/58 to 11/30/59649,035.2412/ 1/59 to 11/30/60102,740.00Highland Homes4/13/55 to 11/30/55$282,061.0012/ 1/55 to 11/30/56673,223.8612/ 1/56 to 11/30/57105,909.4012/ 1/57 to 11/30/58591,464.7112/ 1/58 to 11/30/59721,938.2612/ 1/59 to 11/30/60264,063.73Johnson County Development4/13/55 to 7/31/55None8/ 1/55 to 7/31/56101,400.008/ 1/56 to 7/31/5789,651.328/ 1/57 to 7/31/5838,896.288/ 1/58 to 7/31/5978,593.168/ 1/59 to 7/31/6045,000.00Jay Dee Realty4/13/55 to 11/30/5538,009.2312/ 1/55 to 11/30/56None12/ 1/56 to 11/30/57None12/ 1/57 to 11/30/5891,742.3112/ 1/58 to 11/30/59123,034.7312/ 1/59 to 11/30/6088,828.67Beverly Hills1/10/56 to 3/31/56None4/ 1/56 to 3/31/5782,766.004/ 1/57 to 3/31/58None4/ 1/58 to 3/31/5949,121.004/ 1/59 to 3/31/6047,695.504/ 1/60 to 3/31/6170,330.00Quality Spears (Originally Broad-Calendar years 1954,cast Group, Inc.)1955, 1956 and 1957 21/ 1/58 to 12/31/58691,969.621/ 1/59 to 12/31/59435,240.421/ 1/60 to 12/31/60194,240.00*224 Julius'sNetsalaryincome afterName ofpaid ordeduction ofcorporationaccruedJulius's salarySpears Building$25,000.00$22,621.6433,237.7519,407.7519,407.9926,482.2225,148.6725,000.0041,736.93None2,123.97None3,028.956,000.0018,565.044,000.0011,467.04None293.66Spears Development7,000.0022,071.677,000.0052,398.727,000.0033,009.227,000.0024,904.157,500.0024,452.311,500.0027,129.363,000.0022,776.81None8,370.68Spears Construction15,000.0019,678.7615,000.0054,434.237,000.0056,494.798,000.0026,183.0113,500.0026,490.881,500.0024,844.593,000.0024,978.347,500.0023,285.72Spears Realtynot shownnot shown8,000.0042,170.038,000.0042,870.956,000.0031,694.26None1,494.449,000.0029,110.25None22,859.38None10,369.12Painting & DecoratingNone24,508.25None6,043.042,000.007,997.61None15,620.62None21,882.06None905.87X-Cel ContractingNone25,254.71None14,089.953,000.0010,907.94None6,455.89None19,666.59None14,478.28House BeautifulNone21,970.077,500.0023,695.517,500.0020,723.88None18,659.2612,000.0021,716.05None17.04Highland HomesNone$ 8,167.72None17,859.98None535.269,000.0029,905.5412,000.0024,724.24None6,166.78Johnson County DevelopmentNone24,428.29None24,985.68None24,417.396,000.006,759.766,000.0025,562.856,000.0014,903.02Jay Dee RealtyNone25,861.64None8,080.793,000.0018,479.1712,000.0025,669.0912,000.0024,173.123,000.006,254.99Beverly Hills7,500.0032,117.6512,500.0029,429.54NoneNoneNone9,006.283,000.0020,152.836,000.0028,013.73Quality Spears (Originally Broad-cast Group, Inc.)None9,921.42 3None18,770.61None9,858.51*225 In March 1953 Julius had Spears Development acquire some property near 75th and Walmer Street in Overland Park. This property consisting of about 30 acres was acquired from several different owners in an undeveloped state. Julius eventually platted in into 44 lots under the name of Colonial View, a part of the Prairie Manor Addition. This property was only a few blocks from the most southernly portion of Maple Crest No. 2. The 44 lots were transferred by Spears Development to Spears Construction which built houses thereon. While these houses were under construction there was a teamsters' strike which lasted 19 weeks and delayed completion of some of the houses. Some of the houses had been sold prior to the strike and some sales were lost because of the delay in completion and delivery of the houses. Construction loans had been placed on the houses to finance the*226 building. Since the amount which may be drawn on a construction loan is based on the extent of completion of a house, delay in completion delayed the receipt of the amounts committed on the construction loans. During 1954 Spears Development acquired title to 10 lots and 4 tracts, 2 of which consisted of 2 1/2 acres each, in Johnson County. In 1955 Spears Development acquired title to 9 additional lots in Johnson County. Soon after its organization on April 13, 1955, Julius had Highland Homes acquire from Johnson County Development 19 lots in a section of Johnson County near State Highway 69 known as Tower Court, obtain Veterans Administration or Federal Housing Administration commitments for loans on the properties, let contracts to X-Cel Contracting for the construction of the houses thereon and have the houses sold by Jay Dee Realty. The settlements on these houses were delayed even though the purchasers of some of them had moved into the houses because of difficulty which delayed the completion of a joint sewer being placed by the county under Highway 69. Thereafter, Highland Homes acquired other lots and had houses built and sold in other parts of Johnson County. Julius in*227 his individual capacity acquired land which he platted into a development which he called Rancho Santa Fe. This land was acquired from several different owners. This land included a 120-acre tract which Julius acquired in one purchase on an installment payment basis. For other parts ranging from 20 to 80 acres he had to pay cash. The 120 acres which Julius acquired on the installment basis had no access to a main road and Julius had to acquire other stretches of ground around this acreage to make an acceptable plat of a subdivision. The land was located in Overland Park, Johnson County. The most northernly portion was on 87th Street and the most southernly portion was bordered by 91st Street. On the east the land extended to Antioch Road and on the west to Grant Street. The portion of this property closest to any portion of the Maple Crest No. 2 development was about 17 to 20 blocks away from that development. Julius completed the acquisition of the land which he platted as Rancho Santa Fe around 1957. On February 24, 1955, prior to beginning to accumulate the land which he later platted as Rancho Santa Fe and at a time when he owned no other land in his individual name, Julius entered*228 into a contract with H. O. Peet for the purchase of 170 acres of ground for a price of $425,000, which property Julius had platted as Beverly Hills. The seller of this land required payment in full in cash. Julius paid $40,000 down in cash when the contract was signed. He was able to borrow $225,000 on a mortgage on the land and he raised the remaining portion of the required payment by taking repayment of loans he had made to his various corporations and borrowing money from these corporations. The Beverly Hills property lay on Nall Avenue in the most western portion of Overland Park, Johnson County, Kansas, the other side of Nall Avenue being a part of Prairie Village in Johnson County. The property was bordered on the south by 87th Street and the most westerly corner was between 20 and 25 blocks from the portion of the Rancho Santa Fe development closest to it. During the years in issue in this case most of the development and construction work done and sales made by any of Julius's corporations was in either the Rancho Santa Fe or the Beverly Hills development. On January 23, 1956, the directors of Highland Homes authorized it to enter into an option agreement to acquire*229 37 lots in the Beverly Hills addition from Beverly Hills Development at $40 a front foot, the grantor to pay for all streets, curbs, paving, storm sewers, and utilities. Highland Homes acquired these lots in accordance with the authorization of its directors, employed architects to prepare house plans, applied for and received Veterans Administration and Federal Housing Administration commitments for loans and contracted with X-Cel Contracting to build 37 residences on the 37 lots for a total contract price of $495,350. In April 1955 House Beautiful acquired from Johnson County Development 60 lots in an area of Johnson County known as Garastanna Acres at a cost of $156,000. House Beautiful had plans drawn for the building of houses on these lots, obtained mortgage loan commitments, contracted with X-Cel Contracting to build houses on the lots and arranged for the sale of the houses. On November 16, 1956, House Beautiful acquired from Spears Development 21 lots in the Beverly Hills addition and from Spears Construction 22 lots in the Beverly Hills addition, subject to the installation of sewers, streets, sidewalks, and utilities. House Beautiful obtained loan commitments to build*230 houses on these lots and on January 5, 1957, contracted with X-Cel Contracting to construct the houses. On March 7, 1958, Quality Spears contracted to purchase from Beverly Hills Development 29 lots in Rancho Santa Fe, seller to pay for paving, sewer lines and water mains, closing to be within 6 months from date of contract. Julius continued during the years here in issue to transfer land in the Beverly Hills and Rancho Santa Fe additions to certain of his corporations which would transfer the same propery, usually subject to its development into residential lots by the installation of streets, sidewalks, and utilities, to other of Julius's corporations. The following schedule shows transfers of land by Julius to certain of his corporations with the date of the transfer and the designation of land by lot number and as in the Beverly Hills (shown as BH) or Rancho Santa Fe (shown as RS) additions and the disposition by that corporation of the lots, together with the date of transfer and the amount shown as the price paid in each instance. Acquired fromPropertyDateAcquisitionJulius byacquiredacquiredpriceSpears RealtyLots 8-281956Not shownBlock 6 BHJohnson CountyLots 1, 29, 301956Not shownDevelopmentBlock 6 BHJohnson CountyLots 1-291956$33,113.10DevelopmentBlock 7 BH(Per lot aver-age $1,141.83)Johnson CountyLots 7-23June 1957Not shownDevelopmentBlock 4 RSBeverly HillsLots 1, 24-33June 1957DevelopmentBlock 12 BH$26,053.80Beverly HillsLots 2-12(Per lot aver-DevelopmentBlock 12 BHage $1,184.26)Spears ConstructionLots 1-111957Block 13 BH$26,611.68Spears ConstructionLots 23-331957(Per lot aver-Block 13 BHage $1,209.62)Spears ConstructionLots 19-449/14/58$19,761.00Block 3 RS(Per lot aver-Lots 1-6, 24-28age $534.08)Block 4 RSSpears DevelopmentLots 1-299/14/58$19,068.00Block 11 RS(Per lot aver-Lots 1-7age $529.66)Block 12 RSBeverly HillsLots 1-1311/ 9/58$11,480.00DevelopmentBlock 13 RS(Per lot aver-Lots 1-10age $499.13)Block 14 RSSpears RealtyLots 1-329/28/59$24,307.50Block 10 RS(Per lot aver-age $759.61)Spears RealtyLots 18-269/28/59$7,213.50Block 5 RS(Per lot aver-age $801.50)Spears DevelopmentLots 1-2510/16/59$18,963.00Block 16 RS(Per lot aver-age $754.52)Spears DevelopmentLots 1-2510/16/59$18,375.00Block 16 RS(Per lot aver-age $735.00)Beverly HillsLots 3-510/30/59ApproximatelyDevelopmentBlock 16 BH$4,800.00 (Perlot average$1,600.00)Spears DevelopmentLots 1-27November 1959Not shownBlock 9 RSSpears RealtyLots 1-27November 1959Not shownBlock 7 RS*231 Corporation toDate transferredPriceAcquired fromwhich propertyby acquirerat whichJulius bytransferredfrom JuliustransferredSpears RealtyHighland Homes8/27/58$ 71,880.00 1Johnson CountyHighland Homes8/27/5810,520.00 2DevelopmentJohnson CountySpears Bldg.3/20/59113,200.00 2DevelopmentJohnson CountyQuality Spears6/20/5838,896.28 3DevelopmentBeverly HillsSpears Bldg.11/13/5947,745.00 4DevelopmentBeverly HillsDevelopmentSpears Bldg.7/ 1/6049,770.00Spears ConstructionHighland Homes11/17/5949,275.00Spears ConstructionHighland Homes4/ 1/6050,070.00Spears ConstructionX-Cel9/16/5884,690.00 5ContractingSpears DevelopmentHouse Beautiful10/12/5881,720.00 6Beverly HillsQuality Spears3/2/5949,200.00 7DevelopmentSpears RealtyX-Cel10/ 7/59$69,450.00ContractingSpears RealtyHouse Beautiful11/17/5920,610.00Spears DevelopmentHouse Beautiful10/23/5952,500.00Spears DevelopmentQuality Spears10/23/5954,180.00Beverly HillsJanuary 196120,560.00DevelopmentSpears DevelopmentX-Cel11/21/6066,787.50ContractingSpears RealtyHouse Beautiful11/22/6060,320.00*232 *233 Sometime in the midfifties subsequent to the time he acquired the 170 acres from H. O. Peet, Julius had purchased 40 acres at 83rd and Nall contiguous to his Beverly Hills property from Julia Pherson. This property, subsequent to any year here in issue, was turned over by Julius to a joint venture involving five of his corporations which was organized on December 19, 1960. At the date of the trial of this case, Julius had construction work going on in three projects on land he had acquired sometime prior to the date of the trial of this case. One of the projects was in the town of Leawood, Johnson County, Kansas at 100th Street and Mission Road, approximately 2 miles from the most southeasterly portion of the Beverly Hills addition. Another was in an area being developed under the name of Windgateb at 87th and Mackey Streets which is quite near the Rancho Santa Fe development being just on the east side of Antioch Road, whereas the Rancho Santa Fe development commences on the west side of Antioch Road. Another was in an area platted by J. C. Nicholas as Oak Park in the township of Overland Park in Johnson County and was located at 98th and Bellentine Streets. Each of the 12 corporations*234 organized by Julius maintained a bank account in its own name during its entire existence. Each had a separate set of books and records maintained by E. W. Fisher at his office in Mission, Kansas. Every major transaction of each corporation was authorized by minutes of a meeting of its board of directors. Transfers of property by one corporation to another or from Julius to one of the corporations was by deed reciting the property transferred. These deeds were properly recorded. The price at which Julius transferred land to his corporations was determined by him on the basis of his cost of the land plus an amount representing interest and carrying charges. The price at which developed or to-be-developed lots were transferred by one corporation to another was an amount determined by Julius either on a front footage basis or otherwise to represent the market price of the developed lot being transferred. Julius as president of the various corporations which built houses and those which contracted to have houses built for them would arrange for the construction loans on the houses and also for the commitments for Government loans to be made to the purchasers. The loans would be made*235 by the lending institution directly to the corporation. Some of the lending institutions would require in some instances that Julius personally endorse the loan. Many of the loans from the Merriman Mortgage Company and Mission Bank to various of Julius's corporations were made without the requirement that the loan be endorsed by Julius personally. Julius arranged for construction loans and the commitments for permanent financing on houses built in the Rancho Santa Fe and Beverly Hills additions with Capital Federal Savings and Loan Association, Mission, Kansas. The commitments for permanent financing in both additions were based on Federal Housing Administration and Veterans Administration guaranteed loans as well as conventional loans which were to be based on 80 percent of appraisal value in the Beverly Hills addition and 75 percent of appraisal value in the Rancho Santa Fe addition. Construction loans were provided for based on approximately 70 percent of the appraised value, the money to be advanced at the rate of 15 percent of the total amount of the construction loan on the first inspection, 35 percent on the second inspection, 30 percent when the house was completed except*236 for exterior paint and interior decorating, and 20 percent on the final inspection of the completed house. Construction loans for building houses of around two-thirds of the appraisal value of the property, the money to be drawn as the building progresses, are customary in the home building industry in the Kansas City area. The construction loans under the commitment obtained by Julius from the Capital Federal Savings and Loan Association were made directly to the corporation building the houses and Julius was not required to personally endorse them. When Julius was arranging on behalf of his corporations for the performance of work such as installation of streets and sidewalks in the developments for his corporations which were having lots developed or electrical or plumbing work on houses under construction for his corporations engaged in house construction with persons not connected with his corporations, he would instruct such person which corporation should receive the bill for the work. Generally the bill would be sent pursuant to Julius's instructions but occasionally some such outside contractor would send the bill to Julius personally or to a corporation other than the*237 one to which Julius had instructed such contractor to send the bill. Generally such bills were returned without payment with the request that they be reissued in accordance with Julius's instructions. Some of the contracts for lot develoment in both the Beverly Hills and Rancho Santa Fe additions were joint contracts between an outside contractor and two or more of Julius's corporations. The costs would be prorated to Julius's various corporations on the basis of the front footage of the lots they owned in the area developed under the joint contract. Soon after he commenced building houses Julius joined the Home Builders' Association. He became president of the local association and secretary, and later vice president, of the Home Builders' Association of Greater Kansas City. He has been a director of the National Association of Home Builders. Through his participation in the Home Builders' Association, Julius was kept informed of many of the problems encountered by builders. He was aware that a builder constructing a house to be sold after its completion might find it necessary to hold the house for an extended period before being able to sell it where the demand for houses would*238 lessen while the house was under construction. Julius was also kept informed on the trend in labor and material costs in the home building industry which through the years here in issue was generally upward. Julius was also informed as to the tax problems in the building industry. He also was generally kept aware of the financial failures among persons engaged in home building. During the years Julius was in the home building business there were some builders in the Kansas City area with whom he was associated in the Home Builders' Association who became bankrupt. It is a common practice in the land development and home building business in Kansas and elsewhere for a land developer to contract to sell to builders lots which have not yet been improved by grading, paving, and installation of utilities, on condition that the seller will make and pay for said improvements. The above practice, because of the down payments and possibly other payments, by the purchasers is a source of cash to the developer before he makes the improvements. It is a common practice in Kansas for the owner of raw undeveloped land to prepare a plat of it into lots and blocks and get the plat approved and*239 filed for convenience in making sale of all or portions of the land to land developers. It is a common practice in Kansas and elsewhere for a house builder to become a land developer after a few years. It is a common practice in Kansas and elsewhere for a land developer to let contracts to independent contractors for all engineering, grading, paving, and installation of sewer and water mains. It is a common practice in Kansas and elsewhere for a land developer to have no full-time employees. It is a common practice in Kansas and elsewhere for a land developer and the owners of adjoining land who desire to improve their land, to enter into a joint development agreement whereby one of them will engage independent contractors to make the grading, paving, and utility improvements, pay the contractors on progress estimates, and bill and receive from the other owners their appropriate shares of such cost. It was a common practice in Kansas and elsewhere for a land developer to establish its selling price on improved residential lots on a price per front foot. The practice has been modified to some extent by arbitrarily decreasing the prices of less desirable lots and increasing*240 the prices of more desirable lots. It has been a common practice in Kansas for home builders to let turnkey contracts to building contractors to construct singlefamily residences according to specific plans for specific projects. It has been a common practice in Kansas and elsewhere for building contractors to let subcontracts to subcontractors for the plumbing, electrical, and painting and decorating work in the building. It has been a common practice in Kansas for building contractors who do their own electrical and plumbing work to subcontract their painting and decorating. In the year 1952 Spears Building Company was listed in the Greater Kansas City telephone directory. Jay Dee Realty was listed in this directory for the years 1958, 1959, and 1960. None of the other corporations was ever listed in any telephone directories from their formation throughout the years here in issue although Highland Homes and X-Cel Contracting had telephones for a few months. The houses built by Julius's various corporations were advertised as "Spears Built Homes" and the name of the corporation building the houses would not appear in the advertising although at times the name of Jay Dee*241 Realty as the sales agency might appear. Julius had a good reputation for the building of fine quality houses and he considered it good advertising to use his name. It is customary in the home building business for a successful builder to use a trade name in advertising his houses for sale. During the years 1958, 1959, and 1960 Spears Building received management service fees from the other 11 corporations. Each of the other corporations accrued these fees and deducted them as business expenses. Spears Building reported the fees received on its income tax returns. The amounts reported as being received were $12,750.00, $20,900.00, and $28,756.06 for its fiscal years ended September 30, 1958, 1959, and 1960. From the time he commenced in the home building business, Julius attempted to acquire land which he believed could be made into a satisfactory development when he found such land available at a price which in his opinion would enable him to develop the land and sell lots or build houses thereon and sell the houses at a profit. In order to continue the land development and home building business on an uninterrupted basis, it is necessary to have available an inventory of land*242 to commence using upon disposing of a current development or project. One of the factors enabling a person to be successful in the land development and home building business is the acquisition of land in a good location for a development at a price which is reasonable for the property acquired. In order to acquire property satisfactory for development into residential lots at a satisfactory price, it is sometimes necessary to pay all or a large portion of the price in cash. At times mortgage loans can be obtained on undeveloped land or such land can be acquired on an installment sales contract. Generally further loans to develop the raw land acquired into developed lots cannot be obtained. Such development can be partially financed by selling lots subject to development and using the down payment received on such lots to defray part of the development costs. Julius, from time to time, borrowed money from his various corporations for which he would give a promissory note bearing interest. At the end of their taxable years 1957, 1958, 1959, and 1960 (1958 through 1961 for Beverly Hills Development, the corporations owned notes receivable due from Julius in the amounts shown on the*243 following schedule: FiscalCompanyyear ended1957195819591960Spears BuildingSept. 30$ 21,000.00$ 50,000.00SpearsNov. 3013,000.00$ 80,000.00$ 45,000.00ConstructionSpearsNov. 3070,500.0045,000.0025,500.00DevelopmentSpears RealtyNov. 3021,500.0040,500.0040,500.00Painting andNov. 3028,000.0041,500.0057,500.0067,500.00DecoratingQuality SpearsDec. 3118,000.0013,000.00X-Cel ContractingNov. 30Highland HomesNov. 3055,000.00House BeautifulNov. 3057,500.0024,000.00Johnson CountyJuly 3132,000.0053,000.00DevelopmentJay Dee RealtyOct. 3144,000.0068,000.0069,500.0074,000.00Beverly HillsMar. 3115,500.0049,500.0043,000.0071,500.00DevelopmentTotal$234,000.00$349,000.00$361,500.00$390,000.00The various corporations also lent money to other of the corporations for which they received interest-bearing promissory notes. At the end of its fiscal year 1957 Spears Building held a note from Painting and Decorating in the amount of $6,900. At the end of its fiscal year 1958 Quality Spears owned a note due from Highland Homes*244 in the amount of $6,000. At the end of its fiscal year 1958 Jay Dee Realty owned a note from Highland Homes in the amount of $4,000 and at the end of its fiscal year 1959 owned a note from Spears Building of $9,000 and a note from Quality Spears of $6,000. At the end of its fiscal year 1957 Johnson County Development owned a note from Highland Homes of $60,000. At the end of its fiscal year 1958 Johnson County Development owned a note from Spears Building in the amount of $11,000 and one from Quality Spears in the amount of $10,000, and at the end of its fiscal year 1959 Johnson County Development owned a note from Spears Building of $37,000 and one due from House Beautiful of $6,000. The following schedule shows notes owned by Spears Construction, Spears Development, and Spears Realty from other of Julius's corporations at the end of their fiscal years 1957, 1958, 1959, and 1960: 1957195819591960Spears ConstructionDue from: Spears Building$96,500.00$67,000.00$75,000.00Highland Homes$17,000.003,000.009,000.00House Beautiful20,000.007,000.00X-Cel Contracting15,500.00Spears DevelopmentDue from: Spears Building$40,816.80$65,000.00$36,500.00Highland Homes50,500.00$16,000.0010,000.00X-Cel Contracting55,000.003,000.0067,587.50Quality Spears26,000.00House Beautiful20,000.001,000.00Spears RealtyDue from: Highland Homes$69,500.00$68,500.00$20,000.00$13,000.00Johnson County Development2,500.0032,000.004,000.00Quality Spears6,000.00X-Cel Contracting41,000.00500.00House Beautiful61,320.00*245 The only cash dividend paid by any of the 12 Spears corporations from the date of its organization through the years in issue in these cases was a $1,500 dividend paid by Spears Realty at the end of its fiscal year 1957. During the years 1957, 1958, and 1959 certain of the corporations declared and issued stock dividends and charged their earned surplus with an amount which was capitalized as representing the stock issued. The following schedule shows the name of the company issuing a stock dividend, the date on which the stock dividend was issued, the number of shares issued, and the total amount charged against earned surplus on account of the stock dividend issued: Total amountCompany issuingNumber ofcharged tostock dividendDate issuedshares issued 1earned surplusSpears Building9/30/587,000$70,000.00Spears Construction11/30/587,50075,000.00Spears Development11/30/586,50065,000.00Spears Realty11/30/574,90049,000.00Painting and Decorating11/30/592,90029,000.00X-Cel Contracting11/30/591,90019,000.00Highland Homes11/30/592,25022,500.00House Beautiful11/30/594,00020,000.00Johnson County Development11/30/591,25025,000.00Jay Dee Realty10/31/5945,00045,000.00*246 Without the reduction for the charge made to earned surplus for the stock dividends but after deduction for income taxes accrued for the year, Julius's corporations had aggregate accumulated earnings for their fiscal years ended in*247 1957, 1958, 1959, and 1960 (1958, 1959, 1960 and 1961 for Beverly Hills Development) as shown in the following schedule: Fiscal yearName of companyended1957195819591960Spears BuildingSept. 30$ 75,932.25$ 88,692.53$ 94,669.48$ 91,685.43SpearsNov. 30113,882.18131,273.39148,758.23165,058.23ConstructionSpearsNov. 30101,609.68120,131.77136,075.54141,935.02DevelopmentSpears RealtyNov. 3088,034.44107,427.48123,483.07130,741.45Painting andNov. 3026,984.2337,918.6653,236.1053,870.21DecoratingX-CelNov. 3035,120.7839,639.9053,406.5163,541.31ContractingHighland HomesNov. 3018,594.0738,307.9855,474.2054,412.69House BeautifulNov. 3046,472.6359,534.1174,735.3474,747.27Johnson CountyDevel-opmentJuly 3151,681.9556,413.7874,183.9573,947.22Jay Dee RealtyOct. 3136,505.5654,326.7271,247.9072,036.06Quality SpearsDec. 31(67,337.42)6,922.4420,061.9226,962.88Beverly Hills1958195919601961Develop-mentMar. 3153,024.8759,329.2773,436.2588,054.09Totals$580,505.22$799,918.03$978,768.49$1,036,991.86*248 The following schedule shows the inventory at end of year, the cost of goods sold, operating expenses, and interest income reported by Spears Development, Spears Realty, Painting and Decorating, and Johnson County Development for their fiscal years ended in 1958, 1959, and 1960: Inventory atCost ofOperatingInterestend of yeargoods soldexpensesincomeSpears Development1958$21,026.21$54,047.17$ 4,308.39$ 3,764.92195990,661.6783,957.165,324.175,898.84196042,588.4261,636.252,454.575,674.00Spears Realty1958$15,408.87$33,868.24$12,012.58$ 3,276.97195976,582.4170,486.962,068.294,675.66196033,003.5352,088.882,435.934,573.93Painting & Decorating1958$12,539.18$115,378.62$ 9,345.42$ 1,294.66195913,882.17159,054.5811,136.472,288.11196014,550.6595,767.1110,069.602,933.66Johnson County Development1958$37,219.79$25,125.69$ 8,320.32$ 1,309.49195926,043.7545,613.918,315.08898.68196040,194.7126,135.387,895.643,934.04Painting and Decorating generally made collections on the work it did for other Spears corporations in a period of*249 from 3 to 5 months from the time the work was performed. On their Federal income tax returns for the calendar years 1958, 1959, and 1960 Julius and Treesa Spears reported taxable income of $41,341.26, $45,954.99, and $49,886.38, respectively. In accordance with the provisions of section 534(b), respondent, on April 5, 1965, sent by certified mail to each Spears Development, Spears Realty, Painting and Decorating, and Johnson County Development a notice informing each of those corporations that respondent proposed to issue a notice of deficiency for its taxable years ended in 1958, 1959, and 1960 including amounts with respect to the accumulated earnings tax imposed by section 531. Pursuant to the provisions of section 534, Spears Development, Spears Realty, and Johnson County Development each sent to respondent a statement of the grounds on which each relied to establish that all or part of the earnings or profits had not been permitted to accumulate beyond the reasonable needs of the business. Painting and Decorating did not submit such a statement of grounds to respondent. The grounds relied upon stated by Spears Development in its statement were as follows: Throughout the*250 years involved the taxpayer was engaged in the land development business - i.e., purchasing "raw land," having the necessary engineering, platting and zoning done, installing sewers, water mains, curbs, paving and other lot improvements and selling the improved residential building sites. Its operations were in Johnson County, Kansas in the vicinity of the towns of Mission and Overland Park. Its accumulated earnings (as set forth in the revenue agent's report) amounted to $101,609.68 at the beginning of the fiscal year ended 11-30-58, $120,131.77 at the beginning of the fiscal year ended 11-30-59, and $136,075.54 at the beginning of the year ended 11-30-60. Most of the lands developed by the taxpayer were purchased from its controlling shareholder, J. D. Spears, and represented parts of farms acquired by him a considerable time before his sales to the taxpayer. On the basis of the experience of the taxpayer and other land developers operating in the same general area, it could reasonably be expected that costs of residential building sites (land plus development costs) would not be less than $2,000.00 per lot. And, in the view of rising costs, the "per lot cost" could have, within*251 the foreseeable future, reasonably been expected to increase to $2,500.00 or more. It is common practice for development companies such as the taxpayer to undertake at one time the development of at least 75 residential lots, requiring a cash "outlay" in excess of $150,000.00 or more than the total accumulated earnings and profits of the taxpayer during the years involved. Accordingly, any accumulation of earnings and profits during these years should not be considered as beyond the reasonable needs of the business. Furthermore, any loans made by the taxpayer during the subject years to its controlling shareholder, J. D. Spears, were bonafide in all respects, were evidenced by negotiable promissory notes bearing reasonable interest with the interest being paid regularly and had frequent payments made on the principal as well. These loans represented temporary loans of available funds until same might be needed in connection with the development business of the taxpayer. Also, they had a direct relationship to the taxpayer's business in that they served as an assurance that land would be available at reasonable prices in the future when needed in connection with the taxpayer's development*252 activities. This was due to the fact that the loans were not made to Mr. Spears individually for his personal benefit, but, instead, were made in order for him to purchase and/or pay for land which might in the foreseeable future be desirable for development into residential building sites. Additional facts and arguments against the imposition of the accumulated earnings tax are set forth in the Protest previously filed against the proposed income tax deficiencies and are incorporated herein by reference. The grounds relied upon by Spears Realty and Johnson County Development in their statements are exactly as those set out in the statement of Spears Development except for a different amount of accumulated earnings at the beginning of each taxable year being shown in those statements. On July 30, 1963, respondent issued a notice of deficiency to each of petitioners herein. With respect to each petitioner respondent stated that the $25,000 exemption from surtax provided by section 11(c) was disallowed for each of the fiscal years ended in 1958, 1959, and 1960 because "it has been determined that you were organized and controlled by a shareholder whose principal purpose was to*253 avoid Federal income tax by attempting to secure the benefit of an allowance which would not otherwise be available." No other adjustments were made in the income as reported by House Beautiful, Highland Homes, and X-Cel Contracting. In the notices sent to Spears Realty, Painting and Decorating, Spears Development and Johnson County Development, respondent determined that each corporation was liable for the accumulated earnings tax imposed by sections 531 and 532. In the computation of the accumulated earnings tax contained in the notices of deficiency to each of these petitioners, respondent showed as to each of its taxable years the "accumulated earnings credit allowable" as none. In the notices sent to Spears Development and Spears Realty the only explanation given with respect to the termination of the accumulated earnings tax was that the corporation "was formed or availed of for the purpose of avoiding the imposition of Federal income tax with respect to your shareholders through the medium of permitting earnings or profits to accumulate instead of being distributed to your shareholders." In the notices sent to Johnson County Development and Painting and Decorating, respondent*254 gave the following explanation with respect to not allowing the $100,000 credit and the imposition of the accumulated earnings tax: Since you were organized and controlled by stockholders, whose principal purpose was to avoid Federal income tax and since you were being availed of for the purpose of avoiding the imposition of income tax with respect to your shareholders by permitting earnings to accumulate instead of being distributed, the $100,000.00 accumulated earnings credit as provided by section 535(c)(2) of the 1954 Code is denied for each of the years ended November 30, 1958, November 30, 1959, and November 30, 1960, * and the accumulated earnings tax imposed by sections 531 and 532 of the Code is asserted for each of those years. Opinion Section 2693 provides that if any person or persons acquire control of a corporation and the principal purpose for which such acquisition was made is the evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other*255 allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. Control for the purpose of section 269 is defined as meaning the ownership of stock, possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation. *256 The facts in the instant cases show that Julius, at the time of the organization of each of petitioners herein, acquired ownership of stock possessing over 50 percent of the voting power, and that this stock also represented over 50 percent of the value of all shares of stock of each corporation. Acquisition of control as that term is used in section 269 has been held to include such acquisition at the time of the formation of a new corporation. Kessmar Construction Co., 39 T.C. 778, 796 (1963), aff'd 336 F. 2d 865 (C.A. 9, 1964). Therefore, the issue with respect to the propriety of respondent's disallowance to each of petitioners herein of the $25,000 surtax exemption hinges entirely on whether Julius' principal purpose in the formation of each corporation was the avoidance of Federal income tax by that corporation by securing the benefit of an additional surtax exemption. 4*257 The question is one of fact. The burden of proving that respondent's determination that the principal purpose of Julius in forming the various petitioner corporations was the avoidance of income tax by securing additional surtax exemptions was erroneous is upon petitioners. Snyder Sons Co. v. Commissioner, 288 F. 2d 36 (C.A. 7, 1961), affirming 34 T.C. 400 (1960). Petitioners argue that they have established that Julius' principal purpose in the formation of the seven petitioners was not the obtaining of additional surtax exemptions by showing that his primary reasons for forming petitioners were (1) to separate the land development, home building, sales, and painting and decorating portions of his home building operations by business functions and also by geographical locale, (2) to limit the risks inherent in a home building business by having a new corporation for certain new developments, (3) to maintain better control over the costs of the various phases of the business operations, and (4) to bring members of his family and two of his employees into partial*258 ownership of his business. Julius in his testimony recited these reasons for the formation of the various corporations pointing specifically to Spears Development and Spears Construction as separating the land development and the construction business, to Painting and Decorating as separating from the other businesses a function normally subcontracted by home builders, to Spears Realty and Jay Dee Realty as separating the sales functions, to X-Cel Contracting as separating the home construction functions from the functions of Highland Homes and House Beautiful which he stated were formed as owning and commitment companies to have homes built in [on] a "turnkey" basis by other contractors, and to Beverly Hills Development as being organized to start a new and risky development in the Beverly Hills addition. He points to X-Cel Contracting, House Beautiful, and Johnson County Development as being organized partially for the reason of giving a stock ownership to his wife, Treesa, his stepchildren and his mother and sisters. He stated that one of the reasons for organizing House Beautiful and Jay Dee Realty was to permit participation by key employees. Julius never specifically denied*259 having knowledge of the tax advantage of obtaining multiple $25,000 surtax exemptions by the formation of separate corporations, and the fair inference from the record is that he definitely knew of this advantage through his accountant E. W. Fisher who kept the books and filed the tax returns of all the corporations and who was on the board of directors of many of them, as well as from information he gathered from participating in the Home Builders Association. Julius did state that there were certain financial disadvantages to separate corporations and he did not know to what extent such disadvantages might offset the Federal income tax advantage resulting from the formation of the multiple corporations. Julius referred to certain additional franchise fees and the fact that losses of one corporation could not be offset by profits of another corporation as disadvantages of multiple corporations. When X-Cel Contracting, Highland Homes, House Beautiful, and Johnson County Development were organized on April 13, 1955, Julius already had one company which had been organized to engage in both the land development and building business and had been engaging in both of those businesses*260 and two additional companies which had been organized in November 1952, one stated to be for land development and one for home building which had been developing land and building houses since their organization. Therefore, no functional separation was accomplished by the formation of the corporations in April 1955 unless the entering into contracts by Highland Homes and House Beautiful with X-Cel Contracting for the construction of houses on lots owned by Highland Homes and House Beautiful could be considered a separate business function. The evidence shows that it has been a common practice in Kansas for home builders to let "turnkey" contracts to building contractors to construct single-family residences according to specific plans for specific projects. There is, however, nothing in the evidence to indicate that a home builder who lets such a contract is in a different "business function" which needs to be separated from the "function" of a home builder which constructs houses itself. The evidence does not show why any business advantage as distinguished from tax saving resulted from having two corporations own lots and another build houses on those lots. X-Cel Contracting did*261 not continue to build only for Julius' other corporations but during the years here in issue built on lots it owned and sold the houses it built. The evidence fails to show that the separation of business functions constituted a bona fide reason for the formation of Highland Homes, House Beautiful, X-Cel Contracting and Johnson County Development in 1955. These corporations operated in the same geographical locale. In fact, petitioners made no specific contention of "operating" in a different "locale" for these specific corporations as distinguished from a general contention of this being a reason for forming multiple corporations. Some of the stock of these corporations was issued to Julius' wife and to trusts for the benefit of his stepchildren and to an employee and to his sisters. However, the amount so issued was small and there is no showing of why stock in existing corporations could not have been issued to these persons if Julius were interested in giving them a share in his business. Julius' explanation was that less money was involved in issuing stock in the new corporations and there existed more growth potential with new corporations. Neither of these reasons is sound*262 when the fact is considered that Julius was the only one who paid in any money for stock, and he was the sole stockholder in the other corporations so that he could have transferred some of his stock or even had authorized but unissued stock issued to anyone he wanted to have a slight participation in his business. There is no explanation why more growth might be expected from these new corporations than from the previously formed corporations when Julius was in complete control of what business was performed by each corporation. Since Julius controlled the land transferred to any corporation and the number of houses built at a time, he has failed to show a substantial need for multiple corporations to limit liability. Julius' personal liability would, of course, have been as limited by one corporation as by many. See J. R. Land Co. v. United States, 361 F. 2d 607 (C.A. 4, 1966). Petitioners have failed to show why any cost control problem could not have been as well handled with separate accounts as with separate corporations. Many of the reasons assigned for the formation of separate corporations in the instant cases are similar to those assigned by the taxpayer in*263 J. R. Land Co. v. United States, supra, where the Court concluded that the trial court had been justified in granting judgment for the Government notwithstanding the jury verdict for this taxpayer since no substantial evidence was presented contrary to the Commissioner's determination that the income of the additional corporations should be taxed to the first formed corporation. Some of the reasons assigned for formation of multiple corporations and facts in the instant cases are similar to those in James Realty Company v. United States, 280 F. 2d 394 (C.A. 8, 1960). In that case the Court sustained the disallowance of a surtax exemption to a corporation organized by a stockholder engaged in the land development and home building business through other corporations where the taxpayer corporation involved was one of several additional corporations organized by the same stockholder with its particular function being to own lots and contract with other corporations to build houses for it on those lots. The earnings history of Julius' existing corporations at the time Highland Homes, House Beautiful, X-Cel Contracting and Johnson County Development were formed*264 was such that there could be no reasonable expectation that Julius would not be able to split the work among them so that losses would not be sustained by certain of the corporations while other corporations had profits. The only pattern of allocation of land to the various corporations and the houses assigned to each to build is one indicating a purpose of profit splitting. Petitioners have totally failed to present any substantial evidence to overcome the determination of respondent that Highland Homes, House Beautiful, X-Cel Contracting and Johnson County Development were formed for the principal purpose of avoiding income tax by securing $25,000 surtax exemptions. The inference from the evidence is clear that the principal purpose of forming these corporations was to avoid income tax by securing the $25,000 surtax exemptions. Some of the evidence supporting this inference will be discussed after the reasons assigned by petitioners for the formation of multiple corporations as they apply to the remaining three petitioners have been analyzed. We sustain respondent's disallowance of the $25,000 surtax exemptions to Highland Homes, House Beautiful, X-Cel Contracting and Johnson County*265 Development for the fiscal years of each here in issue. Spears Development was formed on November 24, 1952, at the same time that Spears Construction was formed. At the time these two corporations were formed Spears Building had completed 20 houses, some of them on the 25 lots in Maple Crest No. 2 which Julius had acquired only partially developed. Spears Building had just ended its first fiscal year of operations with a net income of $22,621.64 after accruing a $25,000 salary for Julius. There remained a portion of Maple Crest No. 2 on which Spears Building had done no building. This land was involved in development in a benefit district and the development had not been completed. Julius had acquired some additional land which he had platted as Edlund's Resurvey which he was ready to develop into building lots and build houses thereon. Spears Building was engaged in both the land development and house building business. The property which Julius platted as Edlund's Resurvey was only a few blocks from the property in Maple Crest No. 2 on which Spears Building had been conducting building operations. The close proximity of this property to the property which Spears Building already*266 had under development is such that the two could not logically be considered to be in different geographical locales. In fact, petitioners do not so much contend that Edlunds Resurvey is in a different geographical locale as they do that Julius desired to divide the functions of land development and house construction. They contend that Edlunds Resurvey was the first "raw land" that Julius had acquired even though the record indicates that approximately half of Maple Crest No. 2 was "raw land" when Julius acquired it and the remainder had very little of the development work completed when it was acquired. The evidence shows that by the years here in issue Spears Construction was engaged in the land development. This fact tends to negate any real intention on Julius' part to separate the land development business from the home construction business in separate corporations. If Julius did intend to separate the land development from home construction activities, there would appear to be no need for two additional corporations instead of only one. Even if Julius had shown some justification for separating the land development from the home building business, this record would still*267 lack evidence of why for this separation he needed a development corporation instead of only a home building corporation. We have before us only Spears Development and not the case of the alleged "home construction" corporation. In its first fiscal year ended November 30, 1953, Spears Development had net income of $22,071.67 after a salary accrued or paid to Julius of $7,000 and Spears Building had net income of $19,407.99 for its fiscal year ended September 30, 1953 after paying or accruing to Julius a salary of slightly over $33,200. Spears Construction for its fiscal year ended November 30, 1953, had net income of $19,678.76 after paying or accruing a $15,000 salary to Julius. By a combination of splitting the property turned over to the various companies for development and the construction of houses between the corporations on a basis which is unexplained in the record and does not coincide with any specific geographical location, and charging his salary to the various corporations in part toward the close of the corporation's fiscal year, Julius effectively kept the net income of all three of these corporations very close to the $25,000 figure of the allowable surtax exemption. *268 Julius's explanation of his allocation of salary to the various corporations was that it was allocated on the basis of work done, but if work done can in any way be judged by gross sales which in a real estate development and construction business is some indication of activity, the salary was not geared to the amount of the corporations' work but much more closely geared to the income of the corporation before the deduction of his salary. For the fiscal year ended in 1953 Spears Construction had over twice the gross sales that Spears Building had but was charged with only half as much salary for Julius. On the basis of all the evidence of record we conclude that petitioners have failed to show that respondent erred in disallowing to Spears Development the $25,000 surtax exemption in each of the years here in issue. When originally organized, Spears Realty did appear to commence performing a function which normally might be judged as a separate function from the functions being performed by Julius' existing corporations since it is not uncommon for real estate developers to have a broker sell houses for them. Julius, when he was operating as a sole proprietorship had sold some*269 houses through brokers but since the formation of Spears Building, he and his wife and an employee, a part-time salesman, had sold the houses. Julius had taken out a real estate broker's license prior to the formation of Spears Realty. However, when the facts with respect to Spears Realty are analyzed, they disclose no substantial purpose in forming the corporation to perform a function separate from Julius' existing corporations. Soon after its formation, Julius had Spears Realty acquire some speculative property which it sold and after the sale of the property Spears Realty began to engage in the development business. There is no showing in the record that any employees of Spears Realty other than Julius had a broker's license issued to him during the little over 2 years that Spears Realty was having allocated to it a commission for selling houses for other Spears Corporations. Therefore, insofar as the record shows, after the formation of Spears Realty Julius continued to sell the houses as he had before with the help of an employed salesman so that the only use of Spears Realty during the first years of its existence was as an entity to which Julius could allocate a percentage*270 of the income from sales. There is no explanation given in the record of why Julius had Spears Realty acquire speculative property to hold for sale at a profit. The inference is that there was never a real intent to use this corporation as a sales agency. This inference is further supported by the fact that Spears Realty was never listed in a telephone directory. It would seem logical that a real estate sales agency would be so listed. Spears Realty for its first full fiscal year ended November 30, 1954, had net income of approximately $42,000 after salary to Julius of $8,000 as compared to $54,000 for Spears Construction after a salary to Julius of $15,000, $52,000 for Spears Development after a salary to Julius of $7,000 and $25,000 for Spears Building after a salary to Julius of $26,000. Shortly after the end of the 1954 fiscal year of these corporations Julius organized six additional corporations to operate in his land development and building business and changed Spears Realty to a "development company." These facts all tend to show that Spears Realty as well as the corporations organized in 1955 was not organized to separate business functions, but was organized for the principal*271 purpose of obtaining additional surtax exemptions as determined by respondent. We, therefore, sustain respondent's disallowance of the $25,000 surtax exemptions to this corporation for each year here in issue. The circumstances of the formation of Painting and Decorating are somewhat different. This company was formed at the suggestion of one of the few satisfactory painting contractors who had been doing subcontracting work on the properties built by Julius's corporations. The record shows that it is customary for builders to subcontract painting and decorating work, and a logical reason for this exists since a different type of employee from the construction workers used by building corporations is needed for this work. Painting and Decorating did employ painters. Pete Parker was the superintendent of the painting operation for Julius and did the work just as he had done as a subcontractor, and Painting and Decorating remained in only the painting and decorating business throughout all of the years here involved. There is no clear indication in the record that at any time it went into any other business since its function in a joint venture which was in the process of being formed*272 in December 1960 after the close of the last taxable year of Painting and Decorating here in issue is not shown. The record does show that although Painting and Decorating did work only for Julius' corporations in the years here in issue, in later years Painting and Decorating did this type of work for builders not connected with Julius or his corporations. Its function was one generally performed by a subcontractor for a home builder. The gross receipts and net income of this corporation indicate that it was performing the painting and decorating for the other corporations on the basis of the value of the work done. The propriety of the formation of a separate corporation to perform a generally accepted separate business function has been recognized as valid if in fact the corporation operates separately and performs as a separate corporation the functions for which it was organized. Aldon Homes, Inc., 33 T.C. 582, 602-603 (1959) and Bush Hog Manufacturing Co., 42 T.C. 713, 723 (1964). Considering the circumstances under which Painting and Decorating was formed, *273 the fact that it performed under contract for Julius's other corporations a separate function which ordinarily was subcontracted and that it continued to perform this function and only this function throughout the years here in issue, we conclude that there was a purpose other than the avoidance of taxes in forming Painting and Decorating. This purpose was of sufficient importance that its existence indicates that the principal purpose for which Painting and Decorating was formed was not the avoidance of Federal income taxes. While Julius could set the prices to be charged for the painting and decorating, the record indicates that the prices fixed were fair for the work done. Julius did not shift this work to any other corporation, and the quantity of the work was governed by the quantity of houses being built by the other Spears corporations. If sufficient houses were not being built to keep the employees of Painting and Decorating busy, the corporation was set up in such a manner that it could do work for other builders. Its earnings indicate a lack of the same control by Julius that was exercised by him over the earnings of his other corporations. In its first year of operations*274 it had earnings of approximately $24,500 and in the following 2 years had earnings of approximately $6,000 and $8,000. In the next year its earnings increased to approximately $15,600; in the fiscal year ended November 30, 1959, to approximately $22,000 and in the fiscal year ended November 30, 1960 it had earnings of a little less than $1,000. In only one year did this company pay or accrue any salary to Julius and that was in its fiscal year ended November 30, 1957, when its net earnings after the accrual of a $2,000 salary were only approximately $8,000 as above stated. This supports Julius's testimony that Pete Parker, the superintendent, ran Painting and Decorating for him as a separate undertaking and that the work done by Painting and Decorating was work normally subcontracted by a home builder. It was advantageous to Julius to have the painting and decorating work in the houses built by his corporation done by his own company so that he could control the quality of the painting work which had a great effect on the salability of the houses. Pete Parker was a satisfactory painter and to retain him it became necessary for Julius to give him a permanent position. While we do not*275 doubt that Julius was aware of and had as one purpose in forming Painting and Decorating the obtaining of the income from this function with the tax advantage of an additional surtax exemption, we conclude from the evidence as a whole that this was not the principal purpose for the formation of this corporation and so hold. Painting and Decorating is therefore entitled to the $25,000 surtax exemption provided by section 11(c) for each of its years here in issue. Sections 531 and 532 impose an accumulated earnings tax on every corporation formed or availed of for the purpose of avoiding the income tax with respect to its shareholders. Section 533 provides that the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business is determinative of the purpose to avoid the income tax with respect to shareholders unless the corporation by the preponderance of the evidence proves to the contrary. In those cases before this Court involving a*276 notice of deficiency based in whole or in part on an allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, section 5345 places on respondent the burden of proof that earnings and profits have been permitted to accumulate beyond the reasonable needs of the business if respondent has not notified the taxpayer before the mailing of the notice of deficiency that the proposed notice of deficiency will include an amount with respect to the accumulated earnings tax. Where such a notice has been sent by respondent and the taxpayer within 30 days submits a statement of grounds together with facts sufficient to show the basis thereof on which it relies to establish that all or any part of the earnings or profits have not been permitted to accumulate beyond the needs of the business, section 534 places on respondent the burden of proof with respect to the grounds set forth in such statement. *277 Section 533 provides only that the accumulation of earnings beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to the shareholders unless the corporation by the preponderance of the evidence shall prove to the contrary. In Pelton Steel Casting Co. 28 T.C. 153, 183 (1957) aff'd 251 F. 2d 278 (C.A. 7, 1958), we concluded with regard to the application of sections 533 and 534 that Congress by enacting these provisions did not "intend to alter or reverse the rules of existing law regarding petitioners' ultimate burden of proving in an accumulated earnings tax case * * * that it was not availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting earnings or profits to accumulate instead of being divided or distributed" except in those cases where the only issue between the parties as to the ultimate fact is with respect to whether the accumulation was necessary for the reasonable needs of the business. Generally the fact that the accumulation*278 was necessary for the reasonable needs of a taxpayer's business constitutes only one factor to be considered in reaching the ultimate determination of whether the accumulation was for the purpose of avoiding the income tax with respect to the shareholders. Pelton Steel Casting Co., supra, at pp. 173 and 184. Young Motor Co. v. Commissioner, 339 F. 2d 481 (C.A. 1, 1964) affirming a Memorandum Opinion of this Court. In the instant case respondent did not mention in any one of his notices of deficiency to Spears Development, Spears Realty, Painting and Decorating or Johnson County Development any accumulation of earnings and profits beyond the reasonable needs of the petitioner's business but merely stated that the corporation had been formed or availed of for the purpose of avoiding imposition of surtax on its shareholders by permitting its earnings or profits to accumulate instead of being distributed. Under these circumstances it is questionable whether section 534 has any relevance to this case. In any event upon consideration of all the facts in the record we have concluded that the evidence affirmatively shows that in no year here in issue did Spears Development or*279 Spears Realty or Johnson County Development permit its earnings to accumulate beyond the reasonable needs of its business. Therefore, the question of upon which party the burden of proof in this regard might rest is of no consequence. Before discussing our reasons for our conclusion as to the reasonable needs of the business of these three petitioners and whether the evidence is sufficient to establish not only the facts as to business needs but the ultimate fact that these three petitioners were not formed or availed of for the purpose of avoidance of income tax on their shareholders by permitting earnings and profits to accumulate instead of being divided or distributed, we will dispose of the accumulated earnings tax issue with respect to Painting and Decorating. Section 535(c) provides that in the case of a corporation other than a mere holding or investment company the accumulated earnings credit is an amount equal to such part of the earnings and profits for the taxable year as is retained for the reasonable needs of the business minus certain specified deductions and provides that*280 the minimum credit allowable shall in no case be less than the amount by which $100,000 exceeds the accumulated earnings and profits of the corporation at the close of the preceding taxable year. Respondent did not allow any accumulated earnings credit under section 535(c) to any of the four petitioners against which he determined an accumulated earnings tax explaining in the notice of deficiency to Painting and Decorating that the company was formed for the purpose of evading or avoiding income tax by obtaining the $100,000 accumulated earnings credit. Apparently respondent's disallowance of the minimum credit to Painting and Decorating was under section 269 which permits the disallowance of benefits and credits to a corporation where the principal purpose for which it is formed is to avoid tax by obtaining such benefits or credits. 6 For the same reasons we discussed in concluding that respondent erred in disallowing the $25,000 surtax exemption to Painting and Decorating, we hold that Painting and Decorating was not formed for the principal purpose of evading or avoiding Federal income*281 taxes by obtaining the minimum accumulated earnings and profits credit and is therefore entitled to such minimum credit. The facts in the record show that as of the end of its fiscal years 1957, 1958, and 1959, Painting and Decorating had accumulated earnings and profits of $26,984.23, $37,918.66, and $53,236.10, respectively. When each of these amounts is subtracted from the $60,000 or $100,000 to obtain the minimum accumulated earnings and profits credit, the resultant amount is greater than the accumulated taxable income for the purpose of section 531 as determined by respondent in his notice of deficiency. Therefore, Painting and Decorating is not subject to the accumulated earnings and profits taxes provided by section 531. Petitioners argue that respondent erred in not allowing a minimum accumulated earnings credit under section 535(c) to*282 Johnson County Development for each of its fiscal years ended July 31, 1958, 1959, and 1960. 7 It is petitioners' position that respondent is not authorized by section 269 to disallow the minimum accumulated earnings credit provided for by section 535(c) since that section specifically states that "in no case" shall the credit be less than the minimum amount. We need not pass upon this issue since for the reasons hereinafter discussed we conclude that Johnson County Development as well as Spears Development and Spears Realty has proved by a preponderance of the evidence that it was not formed or availed of for the purpose of avoiding income tax on its shareholders by permitting earnings and profits to accumulate instead of being divided and distributed. *283 Petitioners' primary approach to proof of the negative required by the statute to be proven has been to affirmatively show that the reason for the accumulation of the earnings and profits of each of these development companies was to meet the reasonable needs of the companies' business in acquiring and developing land. Petitioners have shown that their loans to Julius were not for any personal purposes of Julius but were to enable him to acquire and hold an inventory or raw land to be transferred to them in order to enable them to continue with the land development business. Respondent argues that the fact that these corporations issued stock dividends and held notes from certain of the home building corporations is evidence that the loans to Julius were not for the purpose of enabling him to acquire land for use of the development companies. While in considering the amount of accumulated earnings and profits we agree with respondent that the amount otherwise computed should not be reduced by the capitalized amount of the stock dividends, we do not consider the fact that stock dividends were issued to be proof that the loans to Julius were not for business purposes. The notes held*284 by the development companies from the home building companies represented a short term transfer of money between the related businesses and under the facts of this case are no indication whether or not the development companies permitted their earnings to accumulate beyond the reasonable needs of their business. The fact that an operation in substance of one business is carried on by multiple corporations creates difficulty in dealing with an accumulated earnings tax issue of only a few of those corporations. However, in the posture of these cases as presented to us and considering the fact that respondent did not determine accumulated earnings tax against all of Julius's corporations and the fact that the cases of certain of the corporations against which such tax was determined are pending before other Courts, we have limited our consideration as much as feasible to the needs of the business and reasonableness of the accumulation of Spears Development, Spears Realty and Johnson County Development. The facts in the record show that during the years in issue the lots transferred by Julius to Spears Development, Spears Realty, and Johnson County Development were transferred at Julius's*285 cost plus an amount representing interest and carrying charges. From the evidence in the record it appears that by the end of the years here in issue Julius had transferred lots in Beverly Hills to his various corporations at amounts totalling approximately $215,000. Since Julius's cost of the raw land which he platted into Beverly Hills without considering any interest or carrying charges was $425,000, it appears that at the end of the years here in issue Julius was holding land in Beverly Hills for which he had paid over $210,000. He was in addition holding land in Rancho Santa Fe part of which he had purchased on an installment contract and land at 83rd and Nall Streets adjoining Beverly Hills. In addition, he had acquired or later acquired land in the town of Leawood, land at 87th and Mackey Streets and land in the Oak Park addition of Oakland Township. The record shows a continuous plan of acquisition of undeveloped land by Julius when he found it at an attractive price so that he was able to have land available for development on a continuous basis. The largest total accumulated earnings and profits (without reduction for stock dividends charged against earnings and profits) *286 of Spears Development, Spears Realty and Johnson County Development at the beginning of any year here in issue was approximately $334,000. This amount is only about $100,000 in excess of the cost to Julius of the land he was holding in Beverly Hills and as we have pointed out he was holding substantial amounts of other land. We recognize that Julius also had two other "development" corporations, Spears Construction and Beverly Hills Development with accumulated earnings and profits. At the beginning of its fiscal year which ended November 30, 1960, Spears Construction without reducing its accumulated earnings and profits for stock dividends declared by it had such an accumulation of $148,758.23, an amount larger than the accumulated earnings and profits it had at any time prior and Beverly Hills Development at the beginning of its fiscal year which ended March 31, 1961, had accumulated earnings and profits of $73,436.25 (without reduction by stock dividends charged to earnings and profits) an amount larger than it had at any prior date. We do not have the cases of these corporations before us and will avoid considering the reasonableness of their accumulated earnings and profits but*287 will make an assumption which the evidence reasonably supports that Julius was holding some of the land in Beverly Hills and Rancho Santa Fe as well as other land which he had acquired for these corporations as well as for the three development companies which are petitioners herein and that he would continue in the future as in the past to transfer land to each of these five corporations. His testimony was that he had purchased the raw land and was holding it for all five of the development companies and his action in the past of transferring some of the land to each corroborates this testimony. The evidence shows that at the end of the fiscal years 1958, 1959 and 1960 of Spears Realty and Johnson County Development there were outstanding loans to Julius by the three corporations totalling $92,000, $117,500 and $119,000, respectively. These amounts would be insufficient to carry the total inventory of raw land that Julius was carrying at each of these dates. Julius's testimony was that his borrowings from the corporations were to enable him to purchase and carry land to be transferred to them and we therefore view the amount of the outstanding loans of each of the three development*288 company petitioners herein to be money being used for the reasonable needs of the corporations' business in that it enabled Julius to keep a supply of raw land so that their business could continue and perhaps grow. Respondent's expert witness prepared a schedule showing as his opinion the operating cash requirements of Spears Development during its fiscal years 1958, 1959 and 1960 of $24,235.98, $69,542.18 and $95,466.34, respectively of Spears Realty for its fiscal year 1958, 1959 and 1960 of $30,668.29, $32,265.73 and $75,058.91, respectively, and for Johnson County Development for its fiscal years 1958, 1959 and 1960 of $58,153.72, $24,002.67 and $39,261.33, respectively. He testified that he had doubted if section 531 was applicable to the development companies, petitioners herein, because of their need for cash and the explanations given to him that their loans to their principal stockholder were for the purpose of acquiring land for development into lots but he found that Julius in his 1961 Federal income tax return had claimed a capital gain on the sale of a piece of land and this information changed his mind. 8 The evidence shows that Julius reported as capital gain (whether*289 properly or not we do not pass upon) the profit on an unsolicited sale to a Baptist Church of a five acre tract which he claimed was unsuitable for development and that he had reported as ordinary income the gain on all other sales of land which he made in 1961 and prior years. Therefore, it appears that the opinion of respondent's expert witness originally was that Spears Development, Spears Realty and Johnson County Development needed all their retained cash and current earnings for their business operations and inventory accumulation if he accepted as true the fact which this record shows to be true that their loans to Julius were for the purpose of enabling him to acquire undeveloped land for them to develop into building lots. *290 The record shows not only that Spears Development, Spears Realty and Johnson County Development needed to have available the land which Julius was acquiring to transfer to them but also that in order to be in a position to develop lots in Beverly Hills and Rancho Santa Fe they needed considerably more cash than the requirements for operating cash which respondent's expert witness stated in his opinion was needed. The evidence shows acquisition of lots by Spears Development in Rancho Santa Fe during the years here in issue in groups of 36, 50 and 27, acquisition of lots by Spears Realty in Rancho Santa Fe in groups of 41 and 27, and by Johnson County Development in Rancho Santa Fe of one group of 17 lots. The evidence also shows an acquisition of a group of 21 lots by Spears Realty in Beverly Hills and an acquisition of a group of 32 lots by Johnson County Development in Beverly Hills. The evidence also shows that the cost of land plus development costs of lots in Rancho Santa Fe ranged around $1,500 per lot and in Beverly Hills around $2,100 per lot. It is therefore apparent that to develop 50 lots in Rancho Santa Fe would cost around $75,000 and to develop 20 lots in Beverly Hills*291 around $42,000. Respondent points to the fact that part of the funds to develop lots would come from payments by the purchaser and for this reason petitioners did not need accmulated earnings for developing lots. The evidence shows that development could be partially financed by down payments from purchasers who bought subject to development but not that such down payments completely or even substantially financed such development. Not only does the record support the need by Spears Development, Spears Realty and Johnson County Construction for funds to develop lots and to lend to Julius to carry land which he had acquired for them but also a need for funds to purchase additional land as it becomes available and to carry their developed lots upon any downturn in the market which the evidence shows occurs from time to time in the real estate business. From the evidence as a whole we conclude that at no time during the years here in issue did Spears Development, Spears Realty or Johnson County Development have sufficient accumulated earnings and profits not to need all of their current years earnings for the reasonable needs of their business. We also conclude that the earnings and*292 profits were allowed to accumulate instead of being distributed in order to meet the reasonable needs of their business and not to avoid income tax with respect to their shareholders. The evidence in the record shows that the development company petitioners herein were organized as multiple corporations to avoid Federal income tax by obtaining additional $25,000 surtax exemptions. If the evidence of the need by each of these corporations for their accumulated earnings in their business were less clear we would be influenced by the tax avoidance reason for the formation of these petitions to infer that a like tax avoidance for the shareholders was at least one of the reasons that the earnings of petitioners were allowed to accumulate and were not distributed. To some extent respondent's argument here is similar to his argument which the Court in James Realty Company v. United States, 176 F. Supp. 306, 314 (U.S.D.C.D. Minn. 1959) affirmed on another issue, 280 F. 2d 394 (C.A. 8, 1960) stated to be "that a corporation found not eligible for the surtax exemption * * * is, ipso facto, a fit subject for the accumulated earnings tax." We agree with the Court*293 in James Realty Co. v. United States, supra, that a corporation found to have been formed to avoid Federal income tax by obtaining a $25,000 surtax exemption which would not otherwise be available, may still prove that the purpose of allowing its earnings to accumulate was not to avoid surtax on its shareholders. The petitioners in these cases proved the lack of such a purpose. We realize that under some circumstances the fact that no dividends have been declared and that loans are made to shareholders both of which facts exist in the instant cases have been held to indicate the accumulation of earnings to be for the purpose of avoiding tax on shareholders. We likewise realize that needing funds for inventory or to hold inventory is not conclusive that the purpose of the accumulation is not to avoid income tax on shareholders. The question is one of fact and on the basis of all the facts of record we have concluded that Spears Development, Spears Realty and Johnson County Development were not formed or availed of in the years here in issue for the purpose of avoiding the income tax with*294 respect to their shareholders by permitting earnings and profits to accumulate instead of being distributed. Since we have concluded that none of petitioners is subject to tax under sections 531 and 532, it is unnecessary to consider petitioners' contention as to the deductibility in computing the income subject to such tax of additional income taxes resulting from the decisions in these cases. Decisions will be entered under Rule 50. Footnotes1. Proceedings of the following petitioners are consolidated herewith: Highland Homes, Inc., Docket No. 5003-63; Spears Realty Company, Inc., Docket No. 5004-63; Spears Painting & Decorating, Inc., Docket No. 5005-63; Spears Development Company, Inc., Docket No. 5006-63; X-Cel Contracting Company, Inc., Docket No. 5007-63; and Johnson Development Company, Inc., Docket No. 5008-63.↩2. All references are to the Internal Revenue Code of 1954.↩1. Originally formed under name of Broadcast Group, Incorporated, on January 15, 1954. On April 23, 1958, the articles of incorporation were amended to change the name to Quality Spears Contractors, Inc. At the date of the change of name, the entire 5,000 shares of authorized capital stock had been issued and were owned by Julius. ↩2. These 20 shares were redeemed by Highland Homes on August 6, 1959, for $200 plus a premium of $5,378.31 charged to earned surplus. ↩3. These 30 shares plus 300 shares which had been issued to this trust as a stock dividend were redeemed on August 11, 1960 for $1,650. ↩4. Clara Spears died and these shares were purchased by the corporation from her estate on March 3, 1958, for $11,708.84, the $10,668.84 of the price which was in excess of par value being charged to earned surplus. ↩5. On February 26, 1958, 100 shares were redeemed for $100 plus a premium of $3,590.30 charged to earned surplus. ↩6. The shares issued to Mary Richards, who later died, were purchased by the corporation from her estate at $2,301.40, the book value, and cancelled on March 6, 1959; also, the shares issued to Elizabeth Warren, who later died, were purchased by the corporation from her estate at $2,377.35, the book value, and cancelled on August 3, 1960.↩1. In addition to gross sales (or receipts) each of the corporations in most years reported other items of income, primarily interest, but also in some instances such items as the "management fees received" reported by Spears Building. ↩2. Cumulative net loss of $67,314.92. ↩3. After deduction of net operating loss.↩1. The sale of these 21 lots was the only transaction reported by Spears Realty on its income tax return for its fiscal year ended November 30, 1958. Cost of sales is shown as $33,868.24 or $1,612.77 per lot. ↩2. These two sales totaling 32 lots were reported by Johnson County Development on its income tax returns for its fiscal years ended July 31, 1959 and July 31, 1960. Total cost of sales reported for the 2 years was $71,749.29 or $2,242.17 per lot. ↩3. The sale of these 17 lots was the only transaction reported by Johnson County Development in its income tax return for its fiscal year ended July 31, 1958. The cost of sales was shown as $25,125.69 or $1,485.63 per lot. ↩4. The sale of these 11 lots is the only transaction reported by Beverly Hills Development on its income tax return for its fiscal year ended March 31, 1960. Cost of sales is shown as $23,946.77 or $2,176.98 per lot. ↩5. The sale of these 37 lots was the only transaction reported by Spears Construction on its income tax return for its fiscal year ended November 30, 1958. Cost of sales was shown on this return as $60,278.14, an average cost per lot of $1,629.68. ↩6. The sale of the 36 lots is the only transaction reported by Spears Development on its income tax return for its fiscal year ended November 30, 1958. The cost of sales is shown as $54,047.17 or $1,501.31 per lot. ↩7. The sale of these 23 lots appears to be the only transaction reported by Beverly Hills Development on its income tax return for its fiscal year ended March 31, 1959, although the reported sales are $49,121. The cost of sales on this return is shown as $39,288.03 which would amount to $1,708.18 per lot.↩1. The shares were issued in accordance with the stock ownership at the date issued, certain changes in ownership in some corporations having occurred by stock purchases or redemptions by the corporations. All the shares issued as dividends by Spears Building, Spears Construction, Spears Development, Spears Realty, Painting and Decorating, and Quality Spears were issued to Julius. Five hundred and seventy shares of the stock of X-Cel Contracting issued as dividends were issued to Julius' wife, Treesa, 250 of the stock dividend shares of Highland Homes were issued to Julius' sister, Ethel Parrino, 900 of such shares of House Beautiful were issued 300 to each of three of the Smith trusts, 4,500 of the dividend shares of Jay Dee Realty were issued to Treesa Spears and 75 shares of Beverly Hills Development. Fifteen stock dividend shares of Beverly Hills Development were issued to Bertenia Bishop. All other stock dividend shares were issued to Julius.↩*. July 31, 1958, July 31, 1959, and July 31, 1960 for Johnson County Development.↩3. SEC. 269, ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General. - If - (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.↩4. Respondent determined no deficiencies in the income tax of Spears Building. In addition to the notices of deficiencies in the cases before this Court, the record includes copies of deficiency notices dated July 30, 1963 which respondent sent to Jay Dee Realty, Quality Spears, and Spears Construction for their fiscal years 1958, 1959, and 1960, and to Beverly Hills Development for its fiscal years 1959, 1960, and 1961. In his notice to Spears Construction he disallowed only a portion of the $25,000 exemption from surtax provided by sec. 11(c), I.R.C. 1954, limiting the surtax exemption to $6,434.96 for its fiscal year 1958, to $12,165.40 for its fiscal year 1959 and $21,303.97 for its fiscal year 1960, which amounts appear to be the portion of such surtax exemption not consumed by Spears Building. Therefore, respondent has apparently exercised the authority granted to him under sec. 269(b)↩ by distributing one $25,000 surtax exemption between Spears Building and Spears Construction. In any event no contention has been made by any of the present seven petitioners that one surtax exemption to the group of twelve corporations has not been allowed by respondent. At the trial of these cases, the Court was informed by counsel for the parties that a case involving each of the taxpayers, Spears Construction, Quality Spears, Jay Dee Realty, and Beverly Hills is pending before a United States District Court.5. SEC. 534. BURDEN OF PROOF. (a) General Rule. - In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall - (1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or (2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection.↩6. Respondent referred to the $100,000 credit although this amount was applicable under section 535(c)↩ only for years beginning after January 1, 1958. The minimum for the fiscal year 1958 of Painting and Decorating would be the extent by which $60,000 exceeded its accumulated earnings and profits at the beginning of its fiscal year.7. Since Spears Realty's accumulated earnings and profits at the beginning of its fiscal year ended November 30, 1958, exceed the $60,000 amount applicable to years beginning prior to January 1, 1958 and its accumulated earnings at the beginning of each of its other fiscal years exceed $100,000, it would not in any event be entitled to any amount of minimum accumulated earnings credit. Since Spears Development's accumulated earnings and profits exceed $100,000 at the beginning of each of its fiscal years ended November 30, 1958, 1959, and 1960, it would not be entitled to any accumulated earnings credit for any of these fiscal years.↩8. His precise testimony was: In the exhibit marked (dI) I made a computation showing the amount of taxable cash requirements of these corporations during each fiscal year. Now when I came down, there was some doubt as to whether the Section 531 of the Internal Revenue Code would apply because of the alleged needs of the Petitioner for money. Now there were a great many loans to the stockholders involved and the explanation was that this money was being used to buy land for development into lots for these development companies primarily to develop, and I was frankly going along very much with this idea. But Mr. Fuller came down with the returns for the succeeding year and in this was a petition from the, a petition from J.D. and Teresa Spears in regard to the claim of a capital gain on the '61 return. Now according to this petition, Mr. Spears bought this land as an investment with the expectation of the, having an increase in the value, that he did not necessarily expect to plat and subdivide this land, and with this information it changed my mind considerably as to the application of this section.↩